Frank C. **FETTERUSSO**, Otto Hofendiener, and Leonard Giardiana, Plaintiffs–Appellants,

v.

**STATE OF NEW YORK**, New York State Office of Mental Health, Defendants–Appellees.

No. 670, Docket 89–2332.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1990.

Decided March 13, 1990.

Michael H. Sussman, Yonkers, N.Y., for plaintiffs-appellants.

Robert Schonfeld, Asst. Atty. Gen. for the State of N.Y., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., New York City, Yolanda M. Pizarro, Charles Davis, Asst. Attys. Gen. for the State of N.Y., of counsel) for defendants-appellees.

William M. Brooks, Mental Disability Law Clinic, Touro College, Jacob D. Fuchsberg Law Clinic, Huntington, N.Y., Brian M. Dworkin, Law Student Intern, for amicus curiae, Project Release.

Before KAUFMAN, MESKILL, and NEWMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

New York's Criminal Procedure Law provides for commitment after a verdict of those found "not responsible by reason of mental disease or defect," N.Y.Crim. Proc.Law § 330.20 (McKinney 1983 and Supp.1990). The statute recognizes a cate-

gory of "quasi-criminal and quasi-civil" patients in the custody of the Commissioner of the New York State Office of Mental Health ("OMH") and under the mental health care of the State. *People v. Ortega*, 127 Misc.2d 717, 734, 487 N.Y.S.2d 939, 952 (1985), *aff'd*, 118 A.D.2d 523, 499 N.Y.S.2d 1018, *aff'd*, 69 N.Y.2d 763, 505 N.E.2d 613, 513 N.Y.S.2d 103 (1987). *See also New York State Dep't of Mental Hygiene v. Broome County*, 89 Misc.2d 354, 356, 391 N.Y.S.2d 360, 361–62 (1977), *aff'd*, 63 A.D.2d 1076, 406 N.Y.S.2d 565 (1978). Our task is to determine whether an amendment to section 43.03(c) of the New York Mental Hygiene Law, which requires those committed under N.Y.Crim.Proc.Law § 330.20(6) to pay for their institutional care while exempting others held pursuant to a criminal court order, undermines the guarantee of equal protection. In addition, we must consider whether Mental Hyg.Law § 43.03(c) (McKinney 1988) conflicts with the protection afforded social security benefits under 42 U.S.C. § 407(a) (1982 & Supp.V.1987) against "execution, levy, attachment, garnishment, or other legal process" in violation of the Constitution's Supremacy Clause.

The facts of this case can be stated briefly. Frank C. Fetterusso, Otto Hofendiener and Leonard Giardiana were committed to the custody of the OMH Commissioner, pursuant to section 330.20(6), upon findings they were not guilty of charged crimes by reason of their mental illnesses and that they had dangerous mental disorders. The statute defines "dangerous mental disorder" as having a mental illness which renders a person a danger to himself or to others. § 330.20(1)(c). Fetterusso is treated at Bronx Psychiatric Center, Hofendiener at Mid–Hudson Psychiatric Center and Giardiana at Kings Park Psychiatric Center.

At the time of appellants' commitment, New York State exempted all persons receiving services while being held pursuant to a criminal court order from paying the costs of their institutional care.[1] Mental Hyg.Law § 43.03. In 1985, however, the New York legislature amended section 43.-03(c) so as not to apply to persons committed to the OMH pursuant to section 330.20 (hereafter also referred to as "mental health acquittees" or simply "330.20s").[2] Thereafter, OMH's Bureau of Patient Resources adopted measures for billing mental health acquittees—directly or through a representative payee appointed by the Social Security Administration—for the cost of their care and treatment and for collecting revenue for the agency.

In the instant case, all OMH assessments are satisfied partially through appellants' social security benefits. Acting as Giardiana's representative payee, the Director of the Kings Park Psychiatric Center deposits Giardiana's social security checks into the patient's hospital account, which the Center's business office debits each month to reflect payment of fees. Acting as representative payee for his brother Frank, Dominick Fetterusso collects appellant's social security benefits and pays the OMH for his brother's care and maintenance. Hofendiener, who does not have a representative payee, deposits his Social Securi-

---

1. After over a century of shifting between counties and the state the expense of maintaining a patient in a state hospital confined there by reason of a court order originating out of a criminal action, *see generally N.Y. State Dep't of Mental Health v. Broome County*, 89 Misc.2d at 356–57, 391 N.Y.S.2d at 362, more recent legislation has aimed to impose liability directly on the individual. In 1980, the statute was revised to provide that persons found "mentally ill" but not dangerous are considered to be committed under the state's civil Mental Hygiene Law. *See* N.Y.Crim.Proc.Law § 330.20(7). Appellants have not alleged that these persons also should be exempt from charges.

2. As amended, Mental Hyg.Law § 43.03(c) provides:

Patients receiving services while being held pursuant to order of a criminal court, *other than patients committed to the department pursuant to section 330.20 of the criminal procedure law*, ... shall not be liable to the department for such services. Fees due the department for such services shall be paid by the county in which such court is located except that counties shall not be responsible for the cost of services rendered patients committed to the department pursuant to section 330.20 of the criminal procedure law. (emphasis supplied).

ty checks directly into his account at the Mid–Hudson Psychiatric Center, and its business office debits his account each month.

For the reasons indicated below, we find that section 43.03 does not offend the Equal Protection Clause nor is there any evidence indicating a conflict with the Social Security Act. Accordingly, we affirm the district court's order granting summary judgment on the cross-motion seeking dismissal of appellants' complaint.

## DISCUSSION

### 1. *Equal Protection*

█ Since section 43.03 does not involve a suspect class of persons and does not impinge on a fundamental right, its exceptional treatment of 330.20s is sound if it rationally serves a legitimate state interest. *Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980); *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961); *Eisenbud v. Suffolk County,* 841 F.2d 42, 45 (2d Cir.1988). Appellants contend that the primary purpose behind the 1985 amendment was to enable the State to obtain Medicaid and Medicare reimbursements for the treatment of 330.20s. Since the housing of mental health acquittees is more "custodial" than "therapeutic," appellants claim that the State is disqualified from such reimbursement. "[B]ecause the legislative purpose for which it *was* enacted has not been and apparently cannot be served," appellants conclude that the statutory exception for 330.20s is irrational.

█ Even should the OMH not qualify for federal reimbursement for treatment of 330.20s,[3] we do not find this dispositive of appellants' equal protection claim. We note that the parties agreed the appellees

would not urge the statute was enacted for the purpose of claiming federal Medicare and Medicaid reimbursement. The State, moreover, is not limited to the purposes articulated during the legislative process. The district court correctly found that securing individual financial contribution toward mental health care serves an obvious legitimate governmental purpose, 715 F.Supp. 1272 at 1273 (S.D.N.Y.1989)—for it reduces the burden on the state fisc. Such purpose is self-evident; its provenance does not owe to the ingenuity of a government lawyer. *Cf. Schweiker v. Wilson,* 450 U.S. 221, 244, 101 S.Ct. 1074, 1088, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting) (skeptical of *post hoc* justifications of a statute).

In any event, we must assess the rationality of section 43.03(c) in charging only mental health acquittees for OMH services. While the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985), the Supreme Court has clarified that "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Baxstrom v. Herold,* 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966) (*citing Walters v. City of St. Louis,* 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954)). *See also Griffin v. Illinois,* 351 U.S. 12, 20, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956).

The State defends its policy of treating 330.20s differently from other persons criminally committed by urging that they are "more analogous" to persons civilly committed (who must pay for OMH services)[4] than to other patients criminally committed.

---

3. At oral argument and in an affidavit of Joel Dvoskin, Associate Commissioner for Forensic Services for the New York State Office of Mental Health, the State proffered as an explanation for not having applied for reimbursement that most committees fall within the 21 to 65 year-old range, for which there is no Medicare/Medicaid reimbursement. We need not resolve this issue to reach our holding.

4. Article 9 of New York's Mental Hygiene Law governs the civil commitment of patients to the state's mental health facilities. § 9.13 (voluntary), § 9.27 (involuntary). Under section 43.-03(a), civil committees are responsible for the costs of their care and treatment. *See In re Gnerre,* 87 Misc.2d 700, 386 N.Y.S.2d 763 (1976). This practice presently is under challenge in the

Appellants, on the other hand, emphasize the criminal court system has an ongoing responsibility for decisions affecting 330.-20s, *e.g.*, furloughs, transfers, releases, which are not solely dependent on the patient's progress or mental condition.

■ These arguments stray from the mark. Section 43.03(c) exempts from fees all persons criminally committed except mental health acquittees. Our inquiry must focus on whether there is a rational basis for treating 330.20s differently from other persons criminally committed, not whether requiring them to pay, as civil committees do, is justified. Accordingly, we must inquire into the nature and purpose of the various categories of criminal commitment and the standards and consequences of release to determine whether disparate treatment of 330.20s is justifiable.

In addition to those found not guilty by reason of a mental defect or illness, three other categories of persons can be ordered into the custody of the OMH by a criminal court: 1) persons being evaluated to determine their fitness to stand trial, N.Y.Crim. Proc.Law § 730.10 (McKinney 1984 & Supp.1990); 2) those deemed incompetent to stand trial, *Id.;* and 3) prisoners in need of care for their mental illnesses, N.Y.Correct.Law § 402 (McKinney 1987).

Between arraignment and sentencing, a court may order a defendant to undergo a fitness examination based on its threshold opinion that the person lacks the capacity to understand the proceedings against him or to assist in his own defense because of a mental disease or defect. N.Y.Crim. Proc.Law §§ 730.10(1), 730.30. Such an examination thus is incidental to the prosecution of a crime. If following a hearing the court is satisfied that the defendant is not incapacitated, the criminal action against him must proceed. *Id.* § 730.30. Similarly, in the case of a person found unfit to stand trial, once the incapacity no longer

exists, the criminal action generally proceeds. *Id.* § 730.50.

Incarcerated prisoners may be committed involuntarily under appropriate circumstances, *see United States ex rel. Schuster v. Herold,* 410 F.2d 1071 (2d Cir.), *cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969). When it is determined that the prisoner is no longer mentally ill or in need of special custodial care, the inmate is returned to prison to serve the remainder of his sentence. *Id.* at 1089. A prison sentence runs during the period of detention in the psychiatric hospital.

Thus, in all three of these instances of criminal commitment, treatment by the OMH apparently is ancillary to the return of the patient to the criminal justice system.

In contrast, mental health acquittees are released into the general population upon the restoration of their mental capacity.[5] *See* § 330.20(12) (if the patient no longer has a dangerous mental disorder and is not mentally ill, the court must release the committee, incorporating in its order a written service plan for treatment on an out-patient basis; if the patient is mentally ill but not dangerous, the court must conditionally transfer the patient to a non-secure facility); *see also* § 330.20(13) (after three or more years of continuous and successful out-patient treatment, a 330.20 committee is eligible for discharge provided the OMH commissioner also finds such action "consistent with the public safety and welfare of the community and the defendant"). Their commitment to a secure OMH facility is not in expiation of a crime or in lieu of serving a prison sentence in the custody and at the expense of the state. *See* § 330.20(7) (if acquittee does not have a dangerous mental disorder and is not mentally ill, the court must discharge the person, unconditionally or subject to an order of conditions).

Thus, requiring only 330.20s to pay for services—and not others criminally commit-

district court in *Balzi v. Surles,* No. 85–8706 (S.D.N.Y., complaint filed November 4, 1985).

**5.** Mere dangerousness, not diagnosed as rooted in a mental disorder, is insufficient to trigger or

sustain the state's authority to commit a person to its secure psychiatric care under § 330.20. *See Matter of Torsney,* 47 N.Y.2d 667, 394 N.E.2d 262, 420 N.Y.S.2d 192 (1979).

ted—rationally serves the goal of shifting the cost of psychiatric services to those beneficiaries of the State's treatment who would have remained outside the reach of the criminal justice system but for their combined present mental illness and dangerousness. Because the nature and purpose of committing a dangerous 330.20 and the standards and consequences of their release differ from others criminally committed, the State is justified in not assuming the financial expense involved in the care and treatment of such patients.

We note, however, one significant limitation to our holding. Since at the time of appellants' commitment the State bore the costs of their care and treatment, we do not have before us the issue whether the state can charge a 330.20 for expenses incurred during the period of "automatic" custody pursuant to an initial examination order, § 330.20(2), (3), (4), (5). Our holding is thus limited to treatment pursuant to a commitment order, § 330.20(6).

*2. Social Security Act*

We also must assess whether satisfaction of payments from appellants' social security benefits conflicts with Section 207 of the Social Security Act, 42 U.S.C. § 407(a) (1982 and Supp. V.1987), which prohibits the transfer or assignment of future payments and provides that "none of the moneys paid or payable ... under [the Social Security Act] shall be subject to execution, levy, attachment, garnishment, or other legal process." Courts have uniformly recognized that the purpose of section 407(a) is to protect social security beneficiaries and their dependents from the claims of creditors. *See Dionne v. Bouley,* 757 F.2d 1344, 1355 (1st Cir.1985); *Ellender v. Schweiker,* 575 F.Supp. 590, 598 (S.D.N.Y.), *appeal dismissed,* 781 F.2d 314 (2d Cir.1986). Under the Supremacy Clause of the United States Constitution, conflict between state and federal laws must be resolved in favor of the overriding federal interest.

Appellants contend that OMH's billing procedures are prohibited by the Supreme Court's construction of section 407 in *Ben-*

*nett v. Arkansas,* 485 U.S. 395, 108 S.Ct. 1204, 99 L.Ed.2d 455 (1988). *Bennett* involved a statute which squarely conflicted with section 407 by authorizing the state to seize a prisoner's property or "estate," including Social Security benefits. Since the instant case does not involve attachment, we find *Bennett* inapposite.

In its brief *amicus curiae,* Project Release also argues that the billing procedures are contrary to section 407's anti-assignment and legal process provisions and to the Supreme Court's holding in *Philpott v. Essex County Welfare Bd.,* 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973). In *Philpott,* the Supreme Court rejected New Jersey's attempt to attach retroactive social security payments deposited in a bank account, despite the fact that petitioner previously had signed a reimbursement agreement in order to receive interim state benefits while his application for the federal benefits was pending. *Id.* at 415–16, 93 S.Ct. at 591–92. The Court held that New Jersey's suit for reimbursement violated § 407 on its face and unlawfully placed the state in the position of preferred creditor. *Id.*

The *amicus* concedes that regulations promulgated by the Secretary of Health and Human Services permit a state institution to serve as a patient's representative payee, 20 C.F.R. 404.2021, and to pay institutional charges, 20 C.F.R. 404.2040(b). It contends, however, that the state may not serve as a patient's representative payee when it simultaneously imposes institutional charges.

■ We will not consider *amicus*'s challenge on appeal to the constitutionality of the appointment of a representative payee because this issue was not raised below. Fetterusso and Giardiana have not objected either to the appointment of their representative payees or to the notice of appointment they received from the Secretary of Health and Human Services—who, moreover, is not a party to this action. While we have some discretion to rule on matters first presented on appeal, *see Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 108 (2d Cir.1988), *cert. de-*

**328**

*nied,* —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989), we find no clear support for *amicus*'s challenge to the appointment of the state institution as a representative payee.

 Nor do we find any evidence in the record to support plaintiff's claims that appellees' billing procedures are coercive or tantamount to "legal process." Congress intended the words "or other legal process" to embrace not only the use of formal legal machinery but also resort to express or implied threats and sanctions. *See, e.g., Moore v. Colautti,* 483 F.Supp. 357, 368 (E.D.Pa.1979), *aff'd,* 633 F.2d 210 (3d Cir. 1980). Thus, section 407(a) is violated when the state places itself in the position of a preferred creditor or coerces payment from protected benefits. *Philpott* and the statute, however, do not eliminate the underlying debt but merely preclude states from enforcing an obligation against protected federal funds. *See Moore,* 483 F.Supp. at 368.

There is no basis for concluding that any of the appellants did not voluntarily agree to the use of their social security benefits to pay the costs of their care and treatment. To withstand defendants' summary judgment motion, appellants were required to designate specific facts indicating a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Appellants failed, however, to submit affidavits or indeed to point to any evidence demonstrating that the representative payees and Hofendiener are coerced into turning over appellants' benefits.

## CONCLUSION

For the foregoing reasons, we affirm the granting of summary judgment.