Luis LOPEZ, individually and on behalf of the General Public; Barbara Bowman; Gary D. Miller, Jr., individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

**WASHINGTON MUTUAL BANK, FA, Defendant–Appellee.**

No. 01–15303.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2002.

Amended Opinion filed May 9, 2002.

Opinion Withdrawn and Filed Aug. 6, 2002.

Robert D. Newman (argued), Western Center on Law & Poverty, Los Angeles, CA. Appearances only by Helen H. Kang, Golden Gate University, San Francisco, CA; Kyra Kazantzis, Mental Health Advocacy Project, Law Foundation of Silicon Valley, San Jose, CA; Gerald A. McIntyre, National Senior Citizens Law Center, Los Angeles, CA; and Dean Paik, Cohen & Paik, San Francisco, CA, for the plaintiffs-appellants.

Matthew L. Larrabee (argued), Heller Ehrman White & McAuliffe, San Francisco, CA. Appearance only by Scott E. Morgan, Heller Ehrman White & McAuliffe, San Francisco, CA, for the defendant-appellee.

Before: D.W. NELSON, NOONAN and HAWKINS, Circuit Judges.

Opinion by Judge MICHAEL DALY HAWKINS; Concurrence by Judge NOONAN.

## ORDER

Appellee's Petition for Rehearing is GRANTED. The Amended Opinion filed

on May 9, 2002, and appearing at 284 F.3d 990 (9th Cir.2002), is withdrawn. An Opinion will be filed contemporaneously with this Order.

## OPINION

MICHAEL DALY HAWKINS, Circuit Judge.

We must decide whether the statutory protections afforded Social Security and Supplemental Security Income ("SSI") beneficiaries are offended by a bank's practice of using directly deposited Social Security and SSI benefits to cover overdrafts and overdraft fees. We must also decide whether plaintiffs' related state law claims are preempted by Office of Thrift Supervision ("OTS") regulations, or whether there are alternate grounds for affirming the district court's dismissal of the state law claims.

## FACTS AND PROCEDURAL HISTORY

The facts of this case are not extremely complex. Each of the named plaintiffs [1] receive Social Security and/or SSI benefits. Each had an account with Washington Mutual, and their benefits were directly deposited into these accounts. At the time the plaintiffs opened their accounts with Washington Mutual and/or it predecessors-in-interest, they executed account agreements which included provisions regarding overdrafts. Though differing in specific language, the agreements generally explained that if an account holder had insufficient account funds to pay a check, the bank had the option of rejecting the check or paying the check, creating an overdraft on the account accompanied by an overdraft fee. Each account agreement also contained a promise to immediately

1. Plaintiffs seek relief on behalf of a class of similarly situated persons. However, the district court deferred ruling on class certification until after ruling on the cross motions for summary judgment.

pay the overdraft amount to the bank. In addition, the bank would notify the account holder in writing in the event an overdraft occurred.

Each of the named plaintiffs then overdrew their accounts, creating overdrafts and incurring overdraft fees. In each case, the next deposit of Social Security and/or SSI benefits was used to satisfy the account deficiency.[2]

The plaintiffs filed their first amended complaint in December 1999, alleging that Washington Mutual's practice of using the directly deposited Social Security and SSI benefits to set off overdrafts and overdraft fees was prohibited by 42 U.S.C. §§ 407(a) and 1383(d)(1). The complaint also alleged several state law claims, including a violation of California Civil Procedure Code § 704.080, California Business and Professions Code § 17200, and the tort of conversion. The parties filed cross-motions for summary judgment. The district court granted Washington Mutual's motion, finding that the bank's practices did not violate federal law and that the state law claims were preempted, or, alternatively, failed for other reasons. Plaintiffs appeal.

## STANDARD OF REVIEW

 This court reviews a grant of summary judgment de novo. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999). Questions of statutory interpretation are reviewed de novo, *Alexander v. Glickman,* 139 F.3d 733, 735 (9th Cir.1998), as are questions of preemption. *Williamson v. General Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.), *cert. denied,* 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000).

## DISCUSSION

### I. Federal Exemption for Social Security and SSI Benefits

 42 U.S.C. § 407(a), involving Social Security benefits, provides:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

42 U.S.C. § 1383(d)(1) extends these protections to SSI benefits as well.

Our caselaw has broadly construed the phrase "other legal process" within Section 407(a). In *Crawford v. Gould,* 56 F.3d 1162 (9th Cir.1995), we addressed California's practice of taking Social Security benefits from institutionalized patients' hospital accounts to pay for the cost of their care and treatment, whether or not the patients had signed a form authorizing such deductions. California argued that its actions were not prohibited by Section 407(a) because they had not resorted to any type of "other legal process" similar to those expressly listed in the statute. *Id.* at 1166. We rejected this argument, noting that Section 407(a) was designed "to protect social security beneficiaries and their dependents from the claims of creditors" (quoting *Fetterusso v. New York,* 898 F.2d 322, 327 (2d Cir.1990)), and that the "cramped reading of § 407 California urges would enable the state to obtain Social Security benefits through procedures that afford less protection than judicial process affords." *Id.* We therefore determined that reading "other legal pro-

---

**2.** Although the reasons for the overdrafts are not material to the outcome in this case, some of the overdrafts at issue were apparently caused by third persons (one plaintiff's daughter used her ATM/debit card in unauthorized ways) or serious mental conditions such as bipolar affective disorder and paranoid schizophrenia.

**904**

cess" to include the practice of withdrawing benefits from the accounts without consent was consistent with the purposes underlying Section 407. *Id.* at 1167–68.

More recently, we decided *Nelson v. Heiss*, 271 F.3d 891 (9th Cir.2001), holding that prison officials could not use veterans' benefits to satisfy overdrafts on an inmate's prison trust account. Although *Nelson* was actually construing 38 U.S.C. § 5301(a), which protects veterans' benefits from creditors, we expressly noted the similarity to Section 407(a) and relied upon Social Security cases to reach the result. *Id.* at 895.[3]

In light of these precedents, plaintiffs contend that Washington Mutual's overdraft practices constitute a seizure of protected benefits by "other legal process." By paying the plaintiffs' checks when there were insufficient funds in the accounts, they argue, the bank essentially extended a loan to the plaintiffs and became a creditor. Washington Mutual then used a self-help equitable remedy to recoup the plaintiffs' debt to the bank. However, even if Washington Mutual's actions in applying the deposit to the account deficit can be construed as some type of legal or equitable action, we agree with the district court that no violation of Section 407(a) occurred in this case because there is simply no indication that the plaintiffs did not voluntarily agree to apply their SSI benefits in such a fashion. *See Crawford*, 56 F.3d at 1167 (distinguishing *Fetterusso*, 898 F.2d at 328, because in *Fetterusso* there was no basis for concluding the patients did not voluntarily agree to use SSI benefits to pay care and treatment costs).

In this case, the plaintiffs voluntarily opened an account with the bank and executed an account holder agreement which outlined the terms and conditions of the bank's overdraft policies. They also established a direct deposit for their benefits (an agreement to which Washington Mutual was not a party). The plaintiffs remained free at all times to close their account or change their direct deposit instructions. Because they did not do so, Washington Mutual argues, each deposit to the account after an overdraft should be treated as a voluntary payment of a debt incurred. We agree.

The plaintiffs, however, argue that a more explicit consent is required under *Crawford*. In *Crawford*, we noted that California failed to obtain a "meaningful consent" from patients before deducting the cost of care from their Social Security benefits. 56 F.3d at 1165. We went on to affirm the district court's order that required the state to notify patients that the benefits "are exempt from legal process and cannot be used to pay the plaintiff's cost of care without the patient's knowing, affirmative and unequivocal consent." *Id.* at 1167.

We do not believe *Crawford* controls the free market banking arrangement present in this case. Several unique concerns were present in *Crawford*, in that the plaintiffs were involuntarily committed and not free to terminate their dealings with the state, incompetent to handle their personal affairs, statutorily obligated to reimburse the state for the cost of their care and required by state law to deposit all of their funds into the hospital trust accounts. *Id.* at 1164. In sharp contrast, the plaintiffs here voluntarily opened their accounts and made arrangements to have their SSI benefits deposited to such accounts. Unlike the mental patients who statutorily incurred debt to the state for their care,

---

**3.** Similar to the language of Section 407(a), Section 5301(a) provides that veterans' benefits "shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary."

the plaintiffs here were not forced to incur overdrafts. Two of the named plaintiffs indicated that they understood the bank's overdraft policies and fully expected that their next deposit of SSI benefits would cover those costs. The plaintiffs also remained free to close their accounts or change their direct deposit instructions, and were therefore able to remove their benefits from the bank's reach if they so desired.

Moreover, the court in *Crawford* noted that the state had been deducting the cost of care from patients' accounts regardless of whether they had authorized the deduction, believing that under state law, the patients lacked the ability to refuse. *Id.* at 1165–66. It then affirmed the district court's order which enjoined the hospital from making further withdrawals without notifying the patient that the benefits are exempt from legal process and obtaining the patient's "knowing, affirmative and unequivocal" consent. *Id.* at 1167. It did not, however, hold that this standard is required in all circumstances when dealing with SSI recipients. Indeed, as Washington Mutual points out, numerous creditors, such as landlords, grocers, etc., are paid daily with Social Security benefits without giving explicit notice to the recipient that such benefits are exempt from legal process or requiring explicit consent by the recipient. For example, we cannot imagine that it would be acceptable for the SSI recipient to write his landlord a paper check each month on an account that con-

tains SSI benefits, but unacceptable for him to establish an automatic deduction from his account for the same expense without receiving express notice that the benefits are exempt from legal process. Such a requirement would ignore the reality of modern banking, which is increasingly paperless. So, too, we believe that precluding automatic payments of overdrafts from directly deposited SSI benefits on these facts would impose an unnecessary hurdle on direct deposits, a practice which Congress has clearly advocated for SSI recipients. See 31 U.S.C. § 3332. In our view, it is sufficient and "meaningful" consent for the recipient to have executed the account agreement which notified him of the bank's standard practice of using deposits to cure overdrafts and then to have provided the bank with a deposit to apply in such fashion.

For similar reasons, we do not believe our decision in *Nelson* compels a contrary result. Prison inmates do not voluntarily open accounts with the prison, do not have the option of receiving their benefits directly and do not voluntarily execute contractual agreements regarding how overdrafts will be treated. Indeed, there is no indication there was any sort of contractual agreement with the prison regarding the application of deposits to overdrafts. Unsurprisingly, we rejected the notion that Nelson had consented to using his veterans' benefits to pay for an overdraft by the mere act of drawing on his account when it had insufficient funds. 271 F.3d at 895.[4]

---

4. We recognize that language in *Nelson* also seems to suggest that any advance consent to the future use of such benefits to correct overdrafts would run afoul of the spendthrift provisions applicable to Social Security and veterans' benefits. *See* 271 F.3d at 895. As a preliminary matter, such language is merely dicta, as there was no consent in *Nelson* and the case actually turned on rejecting the prison's argument that the holds on the account were permissible because they were for main-

tenance and care. *Id.* at 895–96. In any event, in this case we do not believe that there was any future "transfer or assignment" that violated the spendthrift provision. The account holder agreement simply contained a promise to repay any overdraft incurred, with no mention of from what resources. *See Moore v. Colautti,* 483 F.Supp. 357, 367 (E.D.Pa.1979)(agreement to repay state not an impermissible future assignment or transfer where agreement does not specify source

Finally, we recognize that this decision does seem to create tension with the Tenth Circuit's decision in *Tom v. First American Credit Union*, 151 F.3d 1289 (10th Cir.1998). Relying in large part on our decision in *Crawford*, the Tenth Circuit held that a credit union could not use the self-help remedy of setoff to apply Social Security benefits contained in a checking account to satisfy the depositor's separate loan obligation to the bank. *Id.* at 1293. It reached this conclusion even though the depositor had executed an agreement pledging the other deposits as security for the loan and authorizing the credit union to apply deposits to the loan. *Id.* at 1290. The factual situation in *Tom*, however, is also distinguishable, because First American used the Social Security deposits to satisfy a separate, pre-existing debt unrelated to the operation of the depositor's checking account. The act of depositing the funds into the checking account was thus not an indication of an intent to pay the separate debt. Had the depositor consensually arranged an automatic payment of the loan from the account containing the Social Security funds, we suspect the result would have been different.

In addition, although the court in *Tom* relied on *Crawford* with respect to the parameters of "other legal process," the opinion is strikingly silent regarding the language in *Crawford* on the issue of consent. The court did compare the loan agreement to the document the state of New Jersey required welfare recipients to sign as a condition of receiving benefits in *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973), characterizing them both as "contracts of adhesion." *Id.* at 1292. To the extent this could be construed as finding a lack of consent, we fail to see the similarities between a bank customer voluntarily

entering into a loan agreement and a welfare recipient being required to sign an agreement as a condition of receiving direly needed benefits. In any event, we are unpersuaded that *Tom* dictates finding Washington Mutual's overdraft practices are prohibited by Section 407(a).

## II. State Law Claims

Plaintiffs also alleged three state law claims: (1) violation of California Civil Procedure Code § 704.080 (exempting Social Security and SSI benefits in a deposit account from any enforcement action), (2) violation of California Business and Professions Code § 17200 (prohibiting unfair or fraudulent business acts or practices) and (3) the tort of conversion. The district court found that all of these causes of action are preempted by federal regulations promulgated by the OTS pursuant to the Home Owners' Loan Act ("HOLA"). Alternatively, the district court found that even if the claims were not preempted, there could be no violation of Section 17200 and no tort of conversion because there was no wrongdoing or violation of Section 407(a) or Section 704.080.

### A. Preemption of Section 704.080

Federal law preempts state law where Congress' intent to preempt is "explicitly stated in the statute's language....." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). "Federal regulations have no less preemptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

In 1997, the OTS issued 12 C.F.R. § 557.11, which asserted its authority under HOLA to promulgate regulations that

as SSI funds), *aff'd*, 633 F.2d 310 (3d Cir.1980)(Table). It remained within the depositor's discretion what funds to make available to the bank to repay such overdrafts.

preempt state laws affecting federal savings associations. The regulation provides:

> OTS hereby occupies the entire field of federal savings associations' deposit-related regulations. OTS intends to give federal savings associations maximum flexibility to exercise deposit-related powers according to a uniform federal scheme of regulation. Federal savings associations may exercise deposit-related powers as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise effect deposit activities, except to the extent provided in § 557.13.

The OTS then goes on to give some examples of state laws that are preempted by Section 557.11, including state laws purporting to impose requirements governing abandoned or dormant accounts, checking accounts, disclosure requirements, funds availability, savings account orders of withdrawal, and service charges and fees. 12 C.F.R. § 557.12. The OTS regulations also provide that certain types of state law are not preempted, if they only incidentally affect deposit-related activities or are otherwise consistent with the purposes of Section 557.11; these include state contract and commercial law, tort law and criminal law. 12 C.F.R. § 557.13.

We agree that plaintiffs' claim under California Civil Procedure Code § 704.080 is preempted by these regulations. This state law, which exempts Social Security and SSI benefits from any enforcement action, would impose requirements governing "checking accounts" because it would prohibit the use of certain deposits to the accounts to clear overdrafts and mandate the type of disclosures a bank must make regarding account and deposit transactions. It would also impose requirements regarding "funds availability" by prohibiting federal savings associations from treating certain benefits as available to clear overdrafts and pay fees. Finally, it would impose requirements governing "service charges and fees," because it would prohibit the bank from deducting overdraft fees from directly deposited benefits. By imposing requirements governing "checking accounts," "funds availability" and "service charges and fees," Section 704.080 falls within the specific categories of laws that are preempted under Section 557.12.

B. Remaining State Law Claims

■■■ We need not reach the question of preemption regarding the remaining state law claims. Even if we assume that the other state law claims are not preempted, we nonetheless affirm the district court. As the district court recognized as an alternative ground for its decision, the action under Section 17200 and the action for conversion each require some violation of substantive law, and in this case there has been none. Accordingly, the claims fail as a matter of law. *See, e.g., Lazar v. Hertz Corp.,* 69 Cal.App.4th 1494, 1505, 82 Cal.Rptr.2d 368 (1999) (where there is no predicate violation of underlying statute, Section 17200 claims necessarily fail); *Chartered Bank of London v. Chrysler Corp.,* 115 Cal.App.3d 755, 759–60, 171 Cal.Rptr. 748 (1981) (an essential element of a conversion action is the defendant's conversion of the plaintiff's property by a wrongful act).

## CONCLUSION

Washington Mutual's practice of applying directly deposited Social Security and SSI benefits to overdrafts and overdraft charges does not violate 42 U.S.C. § 407(a) & 1383(d)(a) because there was sufficient consent by the plaintiffs to such practice. California Civil Procedure Code § 704.080 is expressly preempted by OTS regulations because it would impose requirements on various deposit-related activities

of a federal savings institution. The plaintiffs' remaining state law claims fail in the absence of a violation of federal or state law.

AFFIRMED.

NOONAN, Circuit Judge, concurring:

I concur in the opinion of the court and add two points:

*First.* Social Security recipients would almost certainly be denied overdraft privileges if Plaintiffs prevailed. No bank would be willing to become vulnerable to class action suits because it paid overdrafts and then reimbursed itself from the deposit of a Social Security check. Under Plaintiffs' theory, not only would it be illegal for a bank to offset an overdraft by a direct deposit from the Treasury to the customer's account, but it would be equally illegal for the bank to accept the customer's own deposit of his/her Social Security check and then pay the overdraft. The proceeds of the customer's own deposit would be Social Security money. *Philpott v. Essex County Welfare Board,* 409 U.S. 413, 417, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973). Consent by a Social Security recipient to reimburse a state agency from Social Security does not permit the state agency to sue to reach his Social Security check after he has deposited it. The funds on deposit after the check has cleared are "readily withdrawable and retained the quantity of 'moneys' within the provision of § 407." *Id.*

The proceeds of a Social Security check in the circumstances of this case, were they seen to be protected from legal process under *Philpott,* would be equally prevented, according to Plaintiffs' argument, from being used by the bank to pay an overdraft. Persons dependant on Social Security would therefore be likely denied overdraft protection. The consequences for them would be serious in charges by the bank on their checks on which the bank denied payment or charges by payees of the dishonored checks. To strip the persons dependant on Social Security of overdraft protection is not to aid but to injure them.

*Second.* Plaintiffs' position appears to rest on a misapprehension of how the banking system actually operates. When a customer, including a beneficiary of Social Security, deposits a check, the check does not instantly put funds in the customer's account. The bank's receipt of payment of the check will not take place at once, but only when the check is cleared. Nonetheless, normally, the customer can withdraw at least a portion of the amount deposited from the bank as soon as the check is deposited. The bank extends the customer credit until the check clears. Under Plaintiffs' theory, a bank could not engage in this customary courtesy with a customer depositing a Social Security check: the bank would put itself in the position, impossible were Plaintiffs' argument accepted, of offsetting the customer's debt at the moment the Social Security check cleared and funds from the Treasury were actually credited to the customer's account.