Nova H. ROBBINS, on her own behalf and as Attorney-in-fact for Robert H. ROBBINS, Plaintiffs–Appellants,

v.

Barbara A. DeBUONO, as Commissioner of the New York State Department of Health, Richard F. Schauseil, as Director of the Monroe County Department of Social Services, Defendants–Appellees.

Docket No. 99–7663

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1999.

Decided June 30, 2000.

RenÉ H. Reixach, Woods, Oviatt, Gilman, Sturman & Clarke, LLP, Rochester, New York, for Plaintiffs–Appellants.

Victor Paladino, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, Peter G. Crary of Counsel, and Peter H. Schiff, Deputy Solicitor General, on the brief), for Defendants–Appellees.

Before: OAKES, STRAUB, and POOLER, Circuit Judges.

POOLER, Circuit Judge:

In March 1997, after suffering a stroke, plaintiff Robert H. Robbins went to live in a nursing home. Slightly less than one year later, his wife and attorney-in-fact, Nova H. Robbins, applied to the Monroe County Department of Social Services ("DSS") for Medicaid coverage for Robert. Nova's monthly income at that time was far below the amount federal and state law allows the "community spouse" of an institutionalized Medicaid recipient to retain, an amount often referred to as the minimum monthly maintenance needs allowance ("minimum income allowance"), see 42 U.S.C. § 1396r–5(d)(3),(g); N.Y. Soc. Serv. Law § 366–c(2)(h); however, her assets exceeded the resource floor or community spouse resource allowance ("resource allowance") by approximately $88,000, see 42 U.S.C. § 1396r–5(f)(2),(g); N.Y. Soc. Serv. Law § 366–c(2)(d). As a result, some months after accepting Robert's Medicaid application, DSS demanded that Nova contribute to the cost of Robert's care from these "excess" assets and threatened to sue her to recover the money it had spent for Robert's care if she refused. A community spouse in Nova's position can request a "fair hearing" at which a New York State Department of Health ("DOH") hearing officer may set a resource allowance above the statutory amount to enable the assets to generate enough income to raise the community spouse's income to the level of the minimum income allowance. See 42 U.S.C. § 1396r–5(e)(2)(C); N.Y. Soc. Serv. Law § 366–c(8)(c). Nova did not request a hearing because DOH uses an "income first" approach in determining whether to raise the resource allowance. That is, New York would have attributed a portion of Robert's Social Security and pension to Nova rather than increasing her resource allowance.

Nova reasonably fears that DOH's "income-first" approach will leave her destitute in her old age because the painful actuarial likelihood is that Robert will die before her. Although Robert's excess income would support Nova during his lifetime, at his death, her income would drop sharply. Nova almost certainly would be better off over the long term if she could

retain all her assets to generate income even at the cost of receiving less of Robert's income in the short term. However, New York's highest court has upheld DOH's determination that the taxpayers who fund the Medicaid program, rather than the community spouse, are entitled to the "bird in the hand" of readily accessible assets, *see Golf v. New York State Department of Social Services,* 91 N.Y.2d 656, 658, 674 N.Y.S.2d 600, 697 N.E.2d 555 (1998), and plaintiffs do not ask us to revisit the conclusion that New York's use of an "income first" method is generally permissible. Instead, they argue that the allocation of Robert's pension and Social Security to Nova violates the anti-alienation provisions of the Employee Retirement Income Security Act ("ERISA") and the Social Security Act. We conclude that DSS' actions and DOH's policies violate the Social Security Act but not ERISA.

## BACKGROUND

### I. The Legal Framework for Medicaid Budgeting Under the Spousal Impoverishment Amendments.

Medicaid is a medical assistance program authorized "to pay for necessary medical care for those eligible individuals whose income and resources do not allow them to meet the costs of their medical needs." *Golf,* 91 N.Y.2d at 659, 674 N.Y.S.2d 600, 697 N.E.2d 555. The federal and state governments jointly fund Medicaid, and DOH administers the Medicaid program in New York. *See id.* at 659 and n. 1, 674 N.Y.S.2d 600, 697 N.E.2d 555. In 1988, Congress enacted the Spousal Impoverishment Amendments to the Medicaid Act, "to end [the] pauperization [of the community spouse] by assuring that [he or she] has a sufficient—but not excessive—amount of income and resources" when the other spouse must go into a nursing home. H.R. Report No. 100–105(II), 100th Cong., 2d Sess. 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 803, 888. Congress set both a minimum income allowance, *see* 42 U.S.C. § 1396r–5(d)(3), and a minimum re-

source allowance, *see* 42 U.S.C. § 1396r–5(f)(2), to protect the community spouse. If the community spouse's income is less than allowed, the institutionalized spouse may transfer income to her to bring her up to the minimum level. *See* 42 U.S.C. § 1396r–5(d)(1)(B). In addition, either the community spouse or the institutionalized spouse can use the fair hearing process to argue that the community spouse's resource allowance is inadequate. If either spouse can establish at a fair hearing "that the ... resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance," DOH and DSS must increase the resource allowance until it can generate the income guaranteed by the minimum income allowance. 42 U.S.C. § 1396r–5(e)(2)(C).

As discussed previously, DOH—unlike agencies in some other states—applies an "income first" policy in determining whether a community spouse is entitled to an increase in her resource allowance. If an institutionalized spouse has enough income to bring the community spouse's income up to the minimum income allowance, DOH and DSS will not increase the resource allowance. Instead, DSS will allow the institutionalized spouse to contribute enough income to the community spouse to bring her income to the minimum level provided by statute. Whether or not the institutionalized spouse contributes his excess income to his spouse, DSS may sue her to recover the "excess" assets that she would otherwise use to generate income.

### II. DSS' Treatment of Robert and Nova's Income.

When Robert became eligible for Medicaid, he received $992.80 from Social Security and $1,870.28 from his pension per month. Nova had a monthly income of $486.80 from Social Security and $395.71 in investment income, far below her minimum income allowance of $2019. Howev-

er, her savings of $169,280.94 exceeded her resource allowance, which was $80,760. Nova declined to contribute her "excess" resources to Robert's care. Although DSS accepted Robert's application, the agency followed up by sending Nova a letter demanding repayment of $19,156.58 expended on Robert's behalf and payment of future expenses. The letter, which was dated September 15, 1998, threatened that if Nova failed to pay the entire amount demanded by September 30, 1998, DSS would "commence an action in New York State Supreme Court to recover the amount of Medicaid paid on your husband's behalf." Underlying DSS' demand is its position that it can consider "the amount of [income] which the institutionalized spouse could transfer to the community spouse, in determining whether the community spouse should be allowed to keep additional resources for the purpose of generating income." Aff'n of Daniel J. Tarantino of April 5, 1999 ¶ 10. Because Robert has more than enough income to bring Nova's income to the allowable level, DSS will not grant her a higher resource allowance whether or not Robert—or Nova on his behalf—actually elects to spend Robert's money for Nova's needs. *See id.* ¶ 6.

### III. Procedural Background

Nova filed this lawsuit, on her own behalf and Robert's on September 23, 1998. She alleged that defendants Barbara A. DeBuono, as DOH commissioner, and Richard F. Schauseil, as DSS director, violated the anti-alienation provisions of the Social Security Act, 42 U.S.C. § 407, and of ERISA, 29 U.S.C. § 1056(d)(1).[1] On January 22, 1999, plaintiffs moved for summary judgment. Defendants filed a cross-motion for summary judgment on April 7, 1999. In a decision and order dated May 10, 1999, the district court determined that DSS' attribution of Robert's income to Nova did not violate either statute because

mere attribution—even if it occurs during a fair hearing—does not subject the Social Security benefits to "legal process" or change the ownership of pension benefits.

### DISCUSSION

Plaintiffs' claims on appeal rest on the central contention that defendants' policy of attributing or deeming income of an institutionalized spouse to a community spouse effectively alienates that income from the institutionalized spouse. Because Robert's income consists of Social Security and a pension subject to ERISA, plaintiffs argue that defendants violated the anti-alienation provisions of these two statutes. Defendants respond principally that no alienation takes place because—despite the threat of a lawsuit that will deplete the assets of the community spouse and the potential use of a fair hearing—the institutionalized spouse can retain all of his income unless he chooses to contribute it to the support of the community spouse.

### I. The Social Security Act

The Social Security Act provides:

(a) The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

(b) No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section.

42 U.S.C. § 407. Defendants clearly did not execute on, levy, attach, or garnish Robert's Social Security benefits. Howev-

---

1. Plaintiffs also claimed that DSS violated the Due Process Clause of the Fourteenth Amendment and notice provisions in both the federal and state statutes. However, the parties settled this claim after the district court's decision.

er, plaintiffs contend that the deeming of Robert's benefits to Nova that would occur in a fair hearing as well as DSS' threat of a lawsuit constitutes "other legal process" within the meaning of Section 407(a). We have employed an "expansive definition of 'legal process,'" *Kriegbaum v. Katz,* 909 F.2d 70, 74 (2d Cir.1990), which "embrace[s] not only the use of formal legal machinery but also resort to express or implied threats and sanctions," *Fetterusso v. State of New York,* 898 F.2d 322, 327 (2d Cir.1990).

The seminal case in this circuit on deeming or attributing Social Security benefits is *Johnson v. Harder,* 383 F.Supp. 174 (D.Conn.1974), *aff'd,* 512 F.2d 1188 (2d Cir. 1975). Because plaintiffs claim that *Johnson* controls and defendants that it is irrelevant, we will explain in some detail the holdings of the district court and this court. Cleo Johnson sued to invalidate a Connecticut welfare regulation that provided that Social Security benefits received by a parent as a representative payee for her children could be considered as income to the parent for purposes of calculating an Aid to Families with Dependent Children ("AFDC") grant to the extent that the Social Security benefits exceeded the budgeted needs of the children. *Johnson,* 383 F.Supp. at 175–76. Even if the parent removed the Social Security recipients from the AFDC unit, their "excess" income would be allocated to the AFDC unit. *See id.* at 178. The district court found that Connecticut's policy failed because the Social Security statute and regulations required a representative payee to use her child's benefits only for the benefit of the child. *See id.* at 179–82. Although the regulations also allowed the representative payee to spend a portion of the benefit on the needs of a "legally dependent spouse, a legally dependent child, or a legally dependent parent of the [Social Security beneficiary]" if all of the beneficiary's needs were satisfied, the district court found that Connecticut's policy impermissibly coerced the representative payee to exercise the discretion offered her by the regulations in favor of herself. *Id.* at 179–82 (quoting 20 C.F.R. § 404.1607 (1974)).

On appeal, this court initially delivered an oral order as follows:

We agree with Judge Blumenfeld that the Connecticut regulations conflict with the federal scheme for providing OASDI benefits. The federal statutes and regulations, taken in conjunction with *Philpott v. Essex County Welfare Board,* 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973), evidence a clear intention that OASDI funds be used for the beneficiary's needs, *as he or his representative payee may best determine.* It would subvert this scheme to permit a state to automatically treat such benefits as available for the needs of a parent or of other children.... Accordingly, we affirm on Judge Blumenfeld's opinion below.

*Johnson v. Harder,* 512 F.2d 1188, 1189 n. 2. (emphasis added). To give its order precedential value, the court then issued a brief per curiam opinion, which said that "[f]or the reasons stated by Chief Judge Kaufman in open court, we affirm on Judge Blumenfeld's opinion below." *Id.* Chief Judge Kaufman's oral order was incorporated in the opinion as a footnote.

■ Defendants argue that because *Johnson* rested on then-existing Social Security regulations rather than on Section 407, it does not support plaintiffs' position. We disagree. First, though *Johnson* explicitly dealt with Social Security regulations not at issue here, the district court in *Johnson* took the view, which this Court at least implicitly endorsed, that the attribution of the children's benefits to the parent for purposes of AFDC calculation left the parent with "no real choice;" rather she was "coerced by the defendant's action" into using the benefits in a certain way. 383 F.Supp. at 180. At least one court, relying in part on *Johnson,* has labeled such a result "administrative coercion." *Manfredi v. Maher,* 435 F.Supp. 1106, 1115 (D.Conn.1977). Nova occupies a posi-

tion that is, in this important respect, analogous to the position of Cleo Johnson. As the representative payee for two children who received Social Security survivors' benefits, Johnson had the legal authority to determine how those children's benefits were spent as long as the Social Security recipients' needs were met. *See Johnson,* 383 F.Supp. at 176–78. However, if she chose to spend the Social Security benefits solely on the two children who actually received them, she and her remaining children would suffer because the state would cut the family's AFDC benefits. Similarly, Nova, who has Robert's power of attorney, has control over his check. If she pays over Robert's Social Security benefits for his current care rather than applying them to her own needs, her future will be jeopardized because DSS will sue to obtain the assets she will need for her support in the future. Just as in *Johnson,* "[t]he effect of the State [policy] in question is to force the [attorney-in-fact] to exercise that discretion in favor of herself." *See id.* at 180. Although the effect on Nova and Robert Robbins may not be as immediate as the effect on Cleo Johnson and her family, the policy nevertheless works the same injustice since Nova, the person who controls Robert's benefits, has been coerced to spend the Social Security benefits on herself rather than Robert. It is precisely that type of administrative coercion that we rejected in *Johnson.*

Moreover, we accepted the district court's reasoning "in conjunction with Philpott." *Johnson,* 512 F.2d at 1189 n. 2. *Philpott,* in turn, relied exclusively on Section 407 to prevent New Jersey from seeking reimbursement for public assistance funds from Social Security Disability funds that had been deposited into a bank account. *See Philpott,* 409 U.S. at 415, 93 S.Ct. 590. Because we relied on *Philpott* to decide *Johnson,* we find that *Johnson* is relevant to our interpretation of Section 407 in this case.

Finally, under *Fetterusso,* the use of express or implied threats falls within the meaning of "legal process" for purposes of Section 407. *See Fetterusso,* 898 F.2d at 327. Because New York's income-first policy, which is implemented both during the fair hearing process and through the express threat of a lawsuit, constitutes an explicit threat to use "legal process" against a community spouse who refuses to expend her husband's Social Security benefits on her own needs, and because threats—implicit or explicit—fall within our definition of "legal process," we hold that the income-first policy as applied to Social Security benefits violates Section 407.

The decisions on which the defendants rely—*Bradley v. Austin,* 841 F.2d 1288 (6th Cir.1988); *Gorrie v. Bowen,* 809 F.2d 508 (8th Cir.1987); *Norman v. St. Clair,* 610 F.2d 1228 (5th Cir.1980); and *Jackson v. Mullany,* 708 F.Supp. 483 (N.D.N.Y. 1989) do not persuade us to the contrary. In *Gorrie, Bradley,* and *Jackson,* courts upheld a federal statutory requirement, *see* 42 U.S.C. § 602(a)(38), that in determining the eligibility of a family for AFDC, the state consider the needs and income of parents or siblings in the household who receive Social Security benefits notwithstanding the fact that those siblings or parents might not wish to apply for AFDC. *See Bradley,* 841 F.2d at 1293, 1297; *Gorrie,* 809 F.2d at 512, 525; *Jackson,* 708 F.Supp. at 487–89. Each of these courts also held that deeming Social Security income to an AFDC unit was not "legal process" and therefore did not violate Section 407(a). *See Bradley,* 841 F.2d at 1294, *Gorrie,* 809 F.2d at 517; *Jackson,* 708 F.Supp. at 489. The latter conclusion conflicts with our holding in *Johnson* that—in light of *Philpott* and implicitly Section 407—state authorities could not deem the income of children receiving Social Security to other members of an AFDC family.[2] *See Johnson,* 512 F.2d at

---

**2.** We do not address the remainder of the analysis in *Gorrie, Bradley,* and *Jackson.* Between *Johnson* and these three cases, Congress amended the AFDC statute to explicitly

1189 n. 2. In *Norman*, the Fifth Circuit upheld the State of Mississippi's practice of deeming one spouse's Social Security benefits to the other spouse when he applied for Medicaid. The Fifth Circuit, like the Eighth and Sixth Circuits, held that mere deeming was not contemplated by the anti-alienation statute. *See id.*, 610 F.2d at 1243. Therefore, like the decisions of those circuits, *Norman* conflicts with *Johnson* and this circuit's definition of "legal process" under Section 407.

## II. ERISA

■ ERISA's anti-alienation provision sweeps far less broadly than does the Social Security Act's cognate section. ERISA requires only that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). The Secretary of the Treasury, by implementing regulation, has defined "assignment" and "alienation" as

> [a]ny arrangement providing for the payment to the employer of plan benefits which otherwise would be due the participant under the plan,

and

> [a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary *a right or interest*

enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)–13(c)(1)(i),(ii) (emphasis added). Defendants—and the majority of courts of appeals that have construed this statute and/or its implementing regulation—conclude that this statutory scheme protects benefits only while they are held by the plan administrator and not after they reach the hands of the beneficiary. *See Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville*, 16 F.3d 52 (3d Cir.1994); *Guidry v. Sheet Metal Workers Int'l*, 10 F.3d 700 (10th Cir.1993), *aff'd in pertinent part on rehearing en banc*, 39 F.3d 1078 (10th Cir. 1994); *but see United States v. Smith*, 47 F.3d 681 (4th Cir.1995). We agree with the majority view. Section 1056(d)'s requirement that pension plans contain a provision against assignment or alienation of benefits does not read comfortably as a prohibition against creditors reaching pension benefits once they have left the hands of the administrator. A statute aimed at preventing forever the alienation of pension benefits logically would contain language similar to that in the Social Security Act. Even assuming Section 1056(d) to be ambiguous, the agency charged with interpreting ERISA, the Department of the Treasury,[3] clearly states that ERISA pre-

---

provide for deeming of Social Security benefits to an AFDC household "notwithstanding" the representative payee provisions of the Social Security Act. We do not decide here whether this amendment would alter our conclusion that a state may not deem the income of a recipient of Social Security to the AFDC unit in which she lives. We simply find that deeming Social Security benefits under the circumstances presented to us is legal process.

**3.** In a recent submission to the court, plaintiffs argue that the Secretary of the Treasury lacks authority to issue regulations implementing Section 1056(d). Plaintiffs' contention rests on a misapprehension of the admittedly confusing history of the division of authority to issue ERISA regulations between the Secretaries of Labor and Treasury. *See*

*generally Guidry*, 10 F.3d at 708–09. Initially, the Treasury Secretary's authority did not include Section 1056(d). *See id.* at 709 (citing 29 U.S.C. § 1202(c)); *see also* 43 Fed. Reg. 6942, 6942–43 (Feb. 17, 1978) (announcement of adoption of 26 C.F.R. § 1.401(a)–13). However, in August 1978, President Jimmy Carter, acting pursuant to the Reorganization Act of 1977, 5 U.S.C. §§ 901–912, transferred authority to implement Section 1056(d) from the Labor Secretary to the Treasury Secretary. Reorganization Plan No. 4 of 1978, reprinted in 1978 U.S.C.C.A.N. 9814, 9815. Congress ratified President Carter's action in 1984. Pub.L. 98–532, 98 Stat. 2705. Six years later, the Supreme Court characterized Section 1.401(a)–13 as the "applicable administrative regulation[ ]" with respect to Section 1056(d), thus removing any doubt as to the

vents only the alienation of "a right or interest enforceable against the plan." 26 C.F.R. § 1.401(a)–13(c)(1)(ii). Because the Department of the Treasury's interpretation is reasonable, it is entitled to deference pursuant to *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and we accept it. Neither DSS nor DOH took or plans to take any action against the plan paying Robert's pension. Therefore, they have not violated ERISA.

## CONCLUSION

We find that defendants violated the anti-alienation provision of the Social Security Act to the extent they allocated Robert's Social Security benefits to Nova but did not violate ERISA by allocating his pension benefits to Nova. We therefore affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

Treasury Secretary's authority. *Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493

U.S. 365, 371–72 and n. 1, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990).