Erma RUCK, Individually and an Voluntary Administrator of the Estate of Paul Krause, Plaintiff,

v.

Antonia NOVELLO, Commissioner, New York State Department of Health, Anthony J. Restaino, Niagara County Department of Social Services, Defendants.

No. 02–CV–6552L.

United States District Court, W.D. New York.

Nov. 24, 2003.

David J. Starkey, Lockport, NY, Rene H. Reixach, Jr., Woods, Oviatt, Gilman LLP, Rochester, NY, for Plaintiff.

Charles D. Steinman, New York State Attorney General, Rochester, NY, Edward P. Perlman, Lockport, NY, for Defendant.

## DECISION AND ORDER

LARIMER, District Judge.

In this action, plaintiff, Erma Ruck ("Ruck"), challenges certain determinations and policies of the New York State Department of Health ("DOH") concerning payment of Medicaid benefits for her late husband who was confined to a nursing home. Specifically, Ruck claims that DOH's actions violate the "spousal impoverishment" provisions of the Medicaid Act, 42 U.S.C. § 1396r–5, and the anti-alienation provision of the Social Security Act, 42 U.S.C. § 407(a). Ruck alleges that defendant DOH wrongfully denied certain requests made on behalf of her late husband, Paul Krause, concerning the alienation of a portion of his Social Security benefit income in favor of plaintiff. Both sides have moved for summary judgment.

## BACKGROUND

### I. Legal Framework

### A. Spousal Impoverishment Provisions of the Medicaid Act

The Medicaid program is intended "to pay for necessary medical care for those eligible individuals whose income and resources do not allow them to meet the costs of their medical needs." *Robbins v. DeBuono,* 218 F.3d 197, 199 (2d Cir.2000) (quoting *Golf v. New York State Dep't of Social Services,* 91 N.Y.2d 656, 659, 674 N.Y.S.2d 600, 697 N.E.2d 555 (1998)), *cert. denied,* 531 U.S. 1071, 121 S.Ct. 760, 148 L.Ed.2d 662 (2001). Medicaid is jointly funded by the federal and state governments, and administered by the states; in New York, Medicaid is administered by DOH. *Robbins,* 218 F.3d at 199.

In order to be eligible for Medicaid, an individual must have income and resources that are below a prescribed level. In general, if the person's income exceeds the prescribed level, the person must "spend down" his income on medical expenses until his income reaches the eligibility level. *Markva v. Haveman,* 317 F.3d 547, 549 (6th Cir.2003); *Himes v. Shalala,* 999 F.2d 684, 686 (2d Cir.1993).

Before 1988, Medicaid's eligibility rules provided that if a married couple sought benefits to pay for the costs of care of one spouse who was living in a nursing home (the "institutionalized spouse"), the couple was required to use nearly all of their income to offset the institutionalized spouse's costs of care. Following the enactment of the spousal impoverishment provisions in 1988, however, the spouse living at home (the "community spouse") is allowed to keep certain income and assets to meet her minimum monthly maintenance needs and to preserve some assets.

The purpose of these provisions is "to end [the] pauperization [of the community

spouse] by assuring that [she] has a sufficient—but not excessive—amount of income and resources while her spouse is in a nursing home at Medicaid expense." H.R. Report No. 100–105(II), 100th Cong., 2d Sess. 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 888. To that end, Congress set both a minimum income allowance for the community spouse, *see* 42 U.S.C. § 1396r–5(d)(2) and (3), and a minimum resource allowance ("resource allowance" or "CSRA"), *see* 42 U.S.C. § 1396r–5(f)(2), to protect the community spouse. This resource allowance allows the community spouse to retain some family assets and not be compelled to dispose of them to assist the institutionalized spouse.

With respect to the income allowance, the statute provides that each state must establish a "minimum monthly maintenance needs allowance" ("needs allowance" or "MMMNA"), which is to be defined with reference to the official "poverty line" as determined each year by the Office of Management and Budget. 42 U.S.C. § 1396r–5(d)(3). The community spouse may receive and maintain monthly income up to the allowance limit. Income in excess of that would be used to defray expenses of the institutionalized spouse.

The statute (42 U.S.C. § 1396r–5(d)(2)) also provides that if the community spouse's other income is below the monthly maintenance needs allowance, then the institutionalized spouse may transfer some of his/her income to bring the community spouse up to the monthly maintenance minimum amount. This sum is defined in Medicaid argot as the CSMIA, or "community spouse monthly income allowance." To the extent that the institutionalized spouse actually does transfer such income, the transferred income is deemed not to be available for contribution to the institution-

alized spouse's costs of care. *See* 42 U.S.C. § 1396r–5(d)(1)(B).

If either spouse is dissatisfied with the determination of any of these various allowances and calculations, that spouse may request a fair hearing concerning that determination. With respect to the resource allowance for the community spouse (CSRA), if either spouse can establish at a fair hearing "that the [CSRA] (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the ... needs allowance," the state must increase the CSRA and allow for the retention of more assets until the community spouse's resources can generate sufficient income to do so. 42 U.S.C. § 1396r–5(e)(2)(C).

In New York, DOH applies an "income first" policy in determining whether a community spouse is entitled to an increase in her resource allowance.[1] That is, if the institutionalized spouse transfers his income to the community spouse under § 1396r–5(d)(1)(B), DOH will consider that income in determining whether the community spouse's income is at or below her needs allowance. Only after considering all the income that is available to the community spouse will DOH consider her resources and whether to increase her resource allowance so as to generate income to elevate her income up the to the maximum income limit or MMMNA.

## B. Anti–Alienation Provision of the Social Security Act

Also relevant to plaintiff's claims here is the anti-alienation provision of the Social Security Act. That statute provides in pertinent part that "[t]he right of any person to any future payment under this subchapter shall not be transferable or assignable,

---

1. The feminine pronoun is used in the hypothetical to represent the community spouse and the male pronoun is used for the institutionalized spouse because that is the factual scenario in this case.

at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process . . . ." 42 U.S.C. § 407.

In support of this claim, plaintiff relies chiefly upon the Second Circuit's decision in *Robbins,* 218 F.3d 197. In *Robbins,* the court held that DOH's then-existing policy of allocating or deeming an institutionalized spouse's income to the community spouse-whether or not the institutionalized spouse *actually* transferred that income to the community spouse-violated this statute. The Court reasoned that the effect of DOH's policy was to force the recipient of Social Security (or a spouse acting with power of attorney) to transfer a portion of the Social Security payment to the community spouse. This coercion resulted because failing to do so would deprive the community spouse of needed funds and "her future w[ould] be jeopardized because DSS [under its then-existing policy] w[ould] sue to obtain the assets she w[ould] need for her support in the future." *Id.* at 202. Thus, the court stated, the community spouse, "the person who controls [the institutionalized spouse's] benefits, has been coerced to spend the Social Security benefits on herself rather than" on her husband. The court said that this type of "administrative coercion" was impermissible. 218 F.3d at 202.

## II. Factual Background

The relevant facts in this litigation are undisputed. Plaintiff, as attorney-in-fact for her husband, filed a Medicaid application on his behalf on May 7, 2001. At that time, Krause (who had been diagnosed with cancer and dementia) was living in a nursing home.[2]

On July 12, 2001, the Monroe County Department of Social Services ("DSS") denied the application because the couple had excess resources. DSS had determined plaintiff's monthly needs allowance to be $2175, and her resource allowance, $74,820.[3] DSS also determined that plaintiff's assets and resources exceeded the permissible resource allowance (CSRA) by $21,718. Although plaintiff's monthly income was $577 below her allowable maximum, DSS refused to increase her CSRA in order to allow her to generate more income; instead, pursuant to the income-first rule, DSS allocated $577 of Krause's available monthly income (his Social Security benefit) to plaintiff.

DSS also rejected what Krause styled as a "conditional refusal" to alienate his income, which that he had executed on July 10, 2001. That document stated:

> Pursuant to the case of *Robbins v. De-Buono* 218 F.3d 197 (2d Cir.2000) the institutional spouse, Paul Krause now submits a conditional refusal of Social Security availability. It is the position of the institutional spouse, Paul Krause that his Social Security is not available to the Community Spouse, Erma Ruck unless it is needed for her support after all available resources have been utilized.

Plaintiff's Aff. (Docket # 10), Ex. B. Krause essentially indicated, then, that he would be willing to alienate his Social Security income in favor of his wife only if, after the use of "all available resources," plaintiff's income remained below her permissible monthly income (MMMNA).

Following DSS's unfavorable determination, Krause requested a fair hearing. Following that hearing, DOH issued a de-

---

**2.** For purposes of this Decision and Order, references to Krause taking action of any kind are understood to mean plaintiff, as his attorney-in-fact, acting on his behalf.

**3.** Unless otherwise noted, all figures are rounded to the nearest dollar.

cision on December 13, 2001, which was favorable, in part. DOH determined that DSS's "practice of automatically allocating the institutionalized spouse's Social Security income to the community spouse" violated *Robbins*. Complaint Ex. B at 9. DOH therefore reversed DSS's denial of Krause's application due to excess resources, and directed DSS to: (1) redetermine coverage to Krause effective May 1, 2001, subject to his contribution toward the cost of his care from his Social Security income in the amount of $878 per month; and (2) permit plaintiff to keep resources above the existing CSRA in order to generate sufficient income to bring her closer to her needs allowance. Complaint Ex. B. at 11. Plaintiff does not challenge that favorable ruling.

DOH, however, rejected Krause's attempt to "conditional[ly]" refuse to alienate his income. In so doing, DOH ruled that "[t]he *Robbins* holding was never intended to circumvent the basic rule of applying income first in determining [Medicaid] eligibility for an institutionalized spouse with a spouse in the community." Complaint Ex. B at 10. DOH stated that

> the *Robbins* Court merely gives the institutional spouse the option of refusing to allow the allocation of Social Security income to the community spouse prior to any allocation of income under the income first method. However, once all of the income that can be distributed to the community spouse is distributed, taking into consideration the anti-alienation provisions of the Social Security Act, and the intent of the institutionalized spouse, the analysis must turn to resources, and cannot then turn back to income after the resources have been considered. This type of conditional methodology would create a "resources

first" analysis, which New York State does not permit.

Complaint Ex. B at 10.

DOH stated that it would therefore ignore the word "conditional" in Krause's July 10, 2001 statement, and treat the document as an unconditional *refusal* by Krause to alienate his Social Security income. That decision also provided that once Krause was eligible for Medicaid benefits, he could change his determination and elect to make a specific portion of his Social Security income available to plaintiff, the community spouse.

Following remand to DSS, DSS issued a new decision on December 28, 2001. In accordance with DOH's directives, DSS determined, contrary to its prior decision, that Krause was eligible for Medicaid as of May 1, 2001. DSS computed Krause's net available monthly income, *i.e.* income available to be applied to the costs of his care, to be $883 in 2001 and $906 in 2002, and directed that Krause apply those amounts to the monthly costs of his care.

On January 1, 2002, Krause made a new and different request of DSS. It is this request that is at the heart of this litigation. Krause requested that DSS retroactively allocate $577 per month of his Social Security income to plaintiff for 2001 (*i.e.*, the amount needed to bring her up to the MMMNA), and $603 per month in 2002. DSS denied that request.

Krause requested another fair hearing. Following the hearing, DOH issued another decision on July 16, 2002.[4] DOH upheld DSS's refusal to give retroactive effect to Krause's January 1, 2002 alienation request, but held that DSS should give the request prospective effect. DOH said that based on its prior fair hearing decision with respect to Krause's "conditional" refusal, DSS properly allocated resources to

---

4. Krause died on March 14, 2002, prior to issuance of the decision.

plaintiff, but budgeted all of Krause's Social Security income in determining his contribution to the cost of his care for 2001. DOH directed DSS to redetermine coverage to Krause effective January 1, 2002[5] using the designated portion of Krause's Social Security income and plaintiff's income, including income generated from her resources.

Plaintiff filed the complaint in this action on October 28, 2002, alleging that, by refusing either to accept Krause's conditional refusal in July 2001, and by failing to give retroactive effect to his January 2002 request to alienate $577 per month for May through December 2001, defendants violated 42 U.S.C. § 407(a), the anti-alienation provision of the Social Security Act. Plaintiff also alleges that defendants violated § 1396r–5(d)(1)(B), which provides that in calculating the institutionalized spouse's net available monthly income, the CSMIA is to be excluded, "but only to the extent income of the institutionalized spouse is made available to (or for the benefit of) the community spouse." Plaintiff seeks declaratory relief, and an order directing DSS to reimburse plaintiff in the amount of $4618.24 for the eight months that defendants refused to allocate retroactively Krause's Social Security benefits ($577 per month) to his wife.

## DISCUSSION

### I. 42 U.S.C. § 407(a)

### A. "Other Legal Process"

As stated, § 407(a) protects Social Security benefits from "execution, levy, attachment, garnishment, or other legal process .... " Plaintiff contends that defendants have subjected Krause's Social Security benefits to the "legal process" of DOH's fair hearing proceedings. Defendants as-

sert that those benefits were not subjected to any legal process within the meaning of the statute.

In *Robbins,* the Second Circuit, noting that in the past it had "employed an 'expansive definition of "legal process," ' " 218 F.3d at 201 (quoting *Kriegbaum v. Katz,* 909 F.2d 70, 74 (2d Cir.1990)), held that "the use of express or implied threats falls within the meaning of 'legal process' for purposes of Section 407." *Id.* at 202. The court then went on to hold that "[b]ecause New York's income-first policy, which is implemented both during the fair hearing process and through the express threat of a lawsuit, constitutes an explicit threat to use 'legal process' against a community spouse who refuses to expend her husband's Social Security benefits on her own needs, and because threats—implicit or explicit—fall within our definition of 'legal process,' ... the income-first policy as [it was then] applied to Social Security benefits violates Section 407." *Id.* The "threat" that the court was referring to was DSS's threat to sue the community spouse to recover the money it had spent for the institutionalized spouse's care if she refused to contribute to the cost of his care from what DSS considered to be her "excess" assets.

A recent United States Supreme Court decision, however, seriously undermines the *Robbins* rationale. In *Washington State Dep't of Social & Health Services v. Guardianship Estate of Keffeler,* 537 U.S. 371, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003), the Supreme Court stated that

"other legal process" should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of

---

**5.** DOH's decision states that DSS should DSS should redetermine coverage "effective January 1, 2001," but this appears to have been

and counsel for both sides agreed at oral argument that it was-a typographical error. *See* Complaint Ex. C at 6.

some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

*Id.* at 385, 123 S.Ct. 1017. The Court held that the State of Washington was *not* using legal process when it was appointed by the Social Security Administration as the "representative payee" of foster care children entitled to Social Security benefits, and, in that capacity, the state used those benefits to reimburse itself for some of its expenditures on the foster care children's behalf.

In its ruling, the Court noted that § 407(a), because of its specific reference to "execution, levy, attachment, [and] garnishment," "uses the term 'other legal process' far more restrictively" than its abstract or generic meaning. *Id.* at 384, 123 S.Ct. 1017. The Court added that this interpretation was confirmed by the Commissioner of Social Security's own similarly "restrictive" understanding of "legal process" as meaning "generally ... a court order," or "any writ, order, summons or other similar process in the nature of garnishment." *Id.* at 385, 123 S.Ct. 1017 (quoting Social Security Administration's Program Operations Manual System GN 02410.001 (2002)), *available at http://policy.ssa.gov/poms.nsf/aboutpoms* (as visited Jan. 23, 2003).

The specific regulations and procedures before the Court in *Keffeler* were dissimilar from the fair hearing process at issue here. Nevertheless, it is significant that that the Court took a narrower view of what constitutes "other legal process" for purposes of § 407(a) than did the Second Circuit in *Robbins*.

The two courts' own characterizations of their interpretation of "legal process" are instructive. Whereas the court of appeals

in *Robbins* noted its "expansive" definition of that term, 218 F.3d at 201, the Supreme Court in *Keffeler* stated that the statute should be construed "restrictively." 537 U.S. at 384, 123 S.Ct. 1017. Similarly, while the *Robbins* court stated that "implied threats and sanctions" could amount to "legal process," the *Keffeler* Court said that the statute required, "at a *minimum*, ... some judicial or quasi-judicial mechanism ... by which *control over property passes from one person to another* in order to discharge or secure discharge of an allegedly existing or anticipated *liability*." *Id.* at 385, 123 S.Ct. 1017 (emphases added).

■ Under the *Keffeler* standards, it does not appear that "legal process" was involved in the instant case. The fair hearing process did not, and could not, direct that control over property be passed from one person to another. By the terms of § 1396r–5(e)(2), a fair hearing simply provides a means by which either spouse can challenge a determination of the CSMIA, the needs or resource allowance, the *attribution* (but not actual transfer) of resources, or certain other specified matters.

The particular matters at issue in the fair hearings in this case also did not directly involve control over property passing from one person to another to discharge some liability. In the first fair hearing, Krause challenged DSS's denial of his application for benefits due to excess resources. In the second, Krause challenged DSS's denial of his request to allocate certain income to plaintiff. DOH held that Krause could do so prospectively for 2002, but not retroactively for 2001. Although that may relate, in a general sense, to the passing of property from Krause to plaintiff, the simple fact is that DOH did *not* direct that control over Krause's property be passed from him to anyone else.

As the Supreme Court stated in *Keffeler*, § 407(b) contemplates a "mechanism, though not necessarily an elaborate one, by which control over property *passes* from one person to another." 537 U.S. at 385, 123 S.Ct. 1017 (emphasis added). In other words, the statute is exactly what its popular name suggests: an "anti-alienation" provision. It is intended to *prevent* Social Security benefits from being alienated through legal process. DOH's refusal to allow Krause to retroactively allocate his income to plaintiff, then, simply does not fall within the scope of that provision.

Furthermore, the allocation requested by Krause was not intended to "discharge or secure discharge of an allegedly existing or anticipated liability." *Id.* Rather, the purpose of the requested allocation was simply to bring plaintiff's monthly income up to her minimum needs allowance. Thus, there was no "legal process" here within the meaning of § 407(b), as that term was defined by the Supreme Court in *Keffeler.*

## B. "Administrative Coercion"

█ Even assuming *arguendo* that there was "legal process" here, I find that defendants' actions do not run afoul of § 407(b) or the Second Circuit's holding in *Robbins.* The fair hearing decisions were qualitatively different from the actions at issue in *Robbins,* and the type of "administrative coercion" that the *Robbins* court proscribed is not present here.

For one thing, as DOH noted in its first fair hearing decision, *Robbins* did not prohibit New York's use of the income-first rule. Noting that the New York Court of Appeals had upheld that rule in *Golf,* 91 N.Y.2d at 658, 674 N.Y.S.2d 600, 697 N.E.2d 555, the *Robbins* court stated that the "plaintiffs [in *Robbins* ] d[id] not ask [the court] to revisit the conclusion that New York's use of an 'income first' method is generally permissible." 218 F.3d at 199.

At any rate, following *Robbins,* the Supreme Court has determined that "the income-first method is a permissible means of implementing" § 1396r–5. *Wisconsin Dep't of Health and Family Services v. Blumer,* 534 U.S. 473, 495, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002).

Given these decisions, DOH properly rejected both Krause's July 2001 "conditional" refusal to alienate his income, and his January 2002 request to allocate certain income to plaintiff retroactively. First, by his conditional refusal to alienate his Social Security income except to the extent "needed for her support after all available resources have been utilized," Krause was essentially asking defendants to apply resources first in determining whether to raise plaintiff's resource allowance. By the very terms of Krause's conditional refusal, defendants, had they acceded to his request, would have had to use "all available resources" first, and then determine whether plaintiff still needed additional income for her support. That is directly contrary to the income-first rule utilized in New York.

Plaintiff correctly observes that, had Krause said when applying for Medicaid benefits that DSS could count $577 of his Social Security benefits as available to plaintiff, defendants would have honored that request. She argues, though, that Krause could not have known ahead of time *exactly* how much income would have to be transferred to plaintiff in order to bring her up to the minimum needs allowance, but that his conditional refusal would have achieved the same result as if he had specifically directed that $577 monthly be allocated to plaintiff.

While this argument has some surface appeal, the fact remains that Krause did *not* direct that a portion of his income be made available to plaintiff. Instead, he *refused* to alienate his income, unless it

was necessary *after* all available *resources* had been used. That is not, contrary to plaintiff's assertion, a distinction without a difference. It would, as stated, have required defendants to adopt a resource-first policy with respect to this one particular couple, which they were not obligated to do.[6]

Plaintiff's position is also based on an overly expansive reading of *Robbins*. The court in *Robbins* did not announce some sweeping rule that an institutionalized spouse can circumvent the income-first rule by either "conditionally" refusing to alienate his income, or by alienating a portion of his income retroactively, after the state agency has taken resources into account. *Robbins* simply held that where the institutionalized spouse has refused to contribute his excess income to his spouse, DSS may not attribute that income to the community spouse anyway, and then sue or threaten to sue her to recover her "excess" assets. As here, the community spouse in *Robbins* was the attorney-in-fact for the institutionalized spouse, and the Second Circuit reasoned that DSS's policy worked an "injustice since [the community spouse], the person who controls [the institutionalized spouse]'s benefits, has been coerced to spend the Social Security benefits on herself rather than" on the institutionalized spouse. 218 F.3d at 202.

The *Robbins's* court's concerns about such "administrative coercion," *id.*, are not present here. Under DOH's fair hearing decisions, plaintiff, as attorney-in-fact for her institutionalized husband, had a choice of either spending those benefits on him, or on herself. If, acting on his behalf, she chose the former course, and refused to alienate Krause's benefits in her favor, Krause's income would not have been allocated to her, and her resource allowance

would have been calculated accordingly (and probably for a greater amount), *i.e.*, without taking Krause's income into account. If instead plaintiff chose to spend all or part of Krause's income on herself, that income would have been attributed to her in calculating her CSRA. In addition, such transferred income, up to the amount of plaintiff's income allowance, would have been deducted from Krause's income in determining what amount of his income was available to defray the costs of his care. That presents a far different situation from the one in *Robbins*, where DSS attributed the institutionalized spouse's income to the community spouse, regardless of whether the institutionalized spouse actually transferred that income to the community spouse. In the case at bar, plaintiff was not "coerced" into spending Krause's income in any particular manner.

It is also worth noting that, as DOH pointed out in both fair hearing decisions, at any time after a determination of eligibility, the institutionalized spouse may inform DSS that he has changed his decision, and that he now wishes to make all or a portion of his Social Security income available to the community spouse. Upon receipt of such notification, DSS will consider such income to be available to the community spouse, effective as of the month in which such notification is received. *See* Complaint Ex. B at 11, Ex. C at 5. Therefore, even if Krause could not have known when he applied for Medicaid benefits the *exact* amount of his wife's CSMIA, once that amount became known, he could have used it to estimate how much of his income to assign to plaintiff prospectively. He, thereafter, could have changed the amount to be alienated from

---

**6.** Had defendants agreed to Krause's request, it is also likely that many other couples would have followed suit, with the result that New York would in effect become a "resource first" state.

month to month, as circumstances dictated.

In addition, it appears from the record that the rate of return on plaintiff's resources was only 0.1%. *See* Complaint Ex. C at 6. Such a low rate of return, which apparently represents a very conservative investment, would presumably have tended not to fluctuate much from month to month, so that plaintiff's CSMIA could be predicted with a reasonable degree of accuracy. Thus, DOH's decisions did not leave plaintiff and her husband without any means to make his income available to her in order to reach her MMMNA.

## II. "Spousal Impoverishment" Provision of the Medicaid Act

 Plaintiff also alleges that defendants' actions violated 42 U.S.C. § 1396r–5(d)(1)(B), which provides:

> **(d) Protecting income for community spouse.** (1) After an institutionalized spouse is determined or redetermined to be eligible for medical assistance, in determining the amount of the spouse's income that is to be applied monthly to payment for the costs of care in the institution, there shall be deducted from the spouse's monthly income the following amounts . . . :
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (B) A community spouse monthly income allowance (as defined in paragraph (2)), but only to the extent income of the institutionalized spouse is made available to (or for the benefit of) the community spouse.

The CSRA is defined in paragraph (2) as, generally, the amount by which the community spouse's MMMNA exceeds "the amount of monthly income otherwise available to the community spouse (determined without regard to such an allowance)." In other words, if the community spouse's actual income falls below the MMMNA, the institutionalized spouse may transfer income to her to make up the difference, and the transferred income is considered not to be available to pay for the institutionalized spouse's care.

I fail to see how defendants violated this statute. First, strictly speaking, there could not have been any violation, since all that the statute requires is that the amount of any transferred income be deducted from the institutionalized spouse's available income. Here, none of Krause's income was transferred to plaintiff, so there was nothing to deduct from his income. As the Supreme Court stated in *Blumer,*

> [a] CSMIA becomes part of the community spouse's income only when it is in fact transferred to that spouse, § 1396r–5(d)(1)(B), which may not occur until "[a]fter [the] institutionalized spouse is determined . . . to be eligible." § 1396r5(d)(1). At that point, the actual CSMIA is deducted from the institutionalized spouse's income, ibid., and is no longer available for medical expenses. Thus, at all times the rule of subsection (b)(1) is honored, for at no time is any income of the community spouse simultaneously deemed available to the institutionalized spouse.

534 U.S. at 493, 122 S.Ct. 962.

Even assuming *arguendo* that a refusal to permit an institutionalized spouse to transfer his income to the community spouse could amount to a violation of § 1396r–5(d)(1)(B), that is not what happened here. Krause could have directed that a specific portion of his income be transferred to his wife, and that request would have been honored. Instead, he requested that DSS utilize plaintiff's assets first, and, if those assets were insufficient to meet plaintiff's needs allowance, transfer whatever income was necessary to bring her up to the MMMNA. As explained, defendants properly denied that

request, which was inconsistent with DOH's lawful income-first rule.[7]

■ The result that I reach here is also in accord with the policies underlying the Medicaid statute, which "is designed to advance cooperative federalism." *Id.* at 495, 122 S.Ct. 962. When interpreting that statute, courts should generally "leave a range of permissible choices to the States ...." *Id.* The states are given "large discretion" with respect to the establishment of both the needs and resource allowances, *id.* at 497, 122 S.Ct. 962, and courts should not "hinder a State's efforts to 'strik[e] its own balance' in the implementation of the Act." *Id.* Particularly in view of these general principles, I find defendants' actions and decisions here to have been both reasonable and lawful.

## CONCLUSION

Plaintiff's motion for summary judgment (Docket # 6) is denied. Defendants' cross-motion for summary judgment (Docket # 13) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

---

**7.** The complaint also asserts a claim alleging that defendants have violated § 1396r–5(d)(3), which provides that "[e]ach State shall establish a minimum monthly maintenance needs allowance for each community spouse ...." This claim is not addressed in either side's motion papers, nor was it discussed at oral argument. As this claim appears to be simply an alternative means of pleading the second claim under the Medicaid statute, it is dismissed for the same reasons stated with respect to plaintiff's claim under § 1396r–5(d)(1)(B).