[811 NYS2d 790]

In the Matter of the Estate of MARGARET M. TOMECK, Deceased. EDWARD M. TOMECK, as Executor of MARGARET M. TOMECK, Deceased, Respondent-Appellant; ROBERT CHRISTOPHER, as Commissioner of Social Services of Saratoga County, Appellant-Respondent, et al., Respondent.

Third Department, March 9, 2006

APPEARANCES OF COUNSEL

*Mark M. Rider, County Attorney,* Ballston Spa (*Hugh G. Burke* of counsel), for appellant-respondent.

*Pierro & Associates, L.L.C.,* Albany (*Louis W. Pierro* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

SPAIN, J.P.

At issue on this appeal is the distribution of the estate of Margaret Tomeck (hereinafter decedent), who died in 2002. Decedent's husband, John Tomeck (hereinafter the husband), was a resident of a skilled nursing facility and a Medicaid recipient prior to his death in 2005. Following decedent's death, petitioner, as executor of decedent's estate, filed a petition and formal accounting to settle decedent's estate. Respondent Commissioner of Social Services of Saratoga County (hereinafter respondent) objected to the accounting, asserting a claim against the estate in the amount of $324,812.16, for Medicaid payments provided to the husband during his lifetime. Respondent moved for summary judgment, demanding that the Saratoga County Department of Social Services (hereinafter DSS) be awarded the full value of decedent's estate, totaling $280,742.99, and petitioner cross-moved for summary judgment seeking dismissal of the claim, approval of the accounting and counsel fees. Sur-

rogate's Court denied respondent's claim for reimbursement, dismissed his objections and granted summary judgment to petitioner, but denied the request for counsel fees. On appeal by both parties, we affirm.

Since passage of the Medicare Catastrophic Coverage Act in 1988, protections exist so that a person who resides in the community need not become totally impoverished before a spouse who requires long-term care will qualify for Medicaid (see 42 USC § 1396r-5; Social Services Law § 366-c; 18 NYCRR 360-4.10). The "community spouse" is entitled to retain a minimum level of income, known as the minimum monthly maintenance allowance (hereinafter MMMA), fixed at $1,976 in 1997, and also to retain a certain amount of assets known as the community spouse resource allowance (hereinafter CSRA), set at $74,820 in 1997. Income and assets in excess of these levels preclude eligibility for Medicaid until the excess has been expended. However, in cases where the community spouse's income is below the MMMA, the community spouse can obtain an increase in his or her CSRA, such that the additional assets in the CSRA will generate the income needed to bring the community spouses's income up to the MMMA (see 42 USC § 1396r-5 [e] [2]; Social Services Law § 366-c [8] [c]).

In 1997, DSS denied Medicaid coverage to the husband, finding that the couple had excess income and assets. Specifically, DSS found that decedent and her husband had combined assets of $123,830.90, resulting in an excess of $45,560.91 above the 1997 CSRA. The husband requested a fair hearing, arguing that decedent was entitled to an increase in the CSRA because her net income—$1,072.24—fell below the MMMA. Following the hearing, the Department of Health upheld the denial of benefits, finding that DSS had properly allocated $903.76 of the husband's income—consisting of Social Security and pension benefits—to decedent, which was sufficient to raise her income to the MMMA.

Thereafter, decedent signed a spousal refusal, attesting that she needed to retain all of her income and assets to maintain herself and, thus, that she could not contribute to the care of her husband. By virtue of the spousal refusal, the husband qualified for Medicaid benefits effective July 1, 1997, despite the fact that DSS continued to adhere to the position that decedent possessed resources in excess of the CSRA. "When medical assistance is furnished to an applicant who has a responsible relative with sufficient income and resources to provide medical as-

sistance, the furnishing of such assistance shall create an implied contract with such relative" (*Matter of Craig*, 82 NY2d 388, 391-392 [1993]; *see* Social Services Law § 366 [3] [a]). DSS's claim against decedent's estate is premised on its assertion that such an implied contract arose with decedent at the time her husband was found eligible to receive benefits, entitling DSS to claim reimbursement from decedent for the medical assistance provided to her husband thereafter.

■ We agree with petitioner that no implied contract arose because it was improper for DSS, in 1997, to allocate Social Security income from the husband to decedent to raise her income level to the MMMA. Thus, because decedent did not have "sufficient income and resources to provide medical assistance" to her husband at that point, no implied contract was created and her estate cannot now be held liable for the medical assistance furnished to her husband (*see Matter of Craig, supra* at 393; *Matter of Dabney*, 104 AD2d 678, 679 [1984]). Although the allocation of income from an institutionalized spouse to a community spouse when determining Medicaid eligibility (i.e., the "income first" method) has been approved (*see Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656, 660 [1998]), the Second Circuit has since held that allocating Social Security income in this manner is a violation of the anti-alienation provision of the Social Security Act (*see Robbins v DeBuono*, 218 F3d 197, 202 [2000], *cert denied* 531 US 1071 [2001]). Section 407 of the Social Security Act states:

> "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, *or other legal process*, or to the operation of any bankruptcy or insolvency law" (42 USC § 407 [a] [emphasis added]).

In *Robbins v DeBuono* (*supra*), the Second Circuit held:

> "Because New York's income-first policy, which is implemented both during the fair hearing process and through the express threat of a lawsuit, constitutes an explicit threat to use 'legal process' against a community spouse who refuses to expend her husband's Social Security benefits on her own needs, and because threats—implicit or explicit—

fall within our definition of 'legal process,' we hold that the income-first policy as applied to Social Security benefits violates [42 USC § 407]" (*id.* at 202).

Respondent argues that the holding in *Robbins* has been undermined by the holding in *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler* (537 US 371 [2003]), where the United States Supreme Court held that Washington's practice of utilizing the Social Security benefits of children who are living in foster care at state expense to help pay for that care did not violate 42 USC § 407. We disagree. In *Keffeler*, the Court stated:

"Thus, 'other legal process' should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability" (*id.* at 384).

Relying on this language, respondent argues that *Keffeler* employed a much more restricted definition of legal process than that discussed in *Robbins* and, thus, respondent argues, *Robbins* no longer controls and New York's application of the "income first" methodology cannot be deemed "legal process" under the anti-alienation provision of the Social Security Act. However, in *Keffeler*, the state was the "representative payee" for the children in its care, a designated recipient of Social Security benefits which it had discretion to use for the benefit of such children (*see* 42 USC § 405 [j] [1] [A]; 20 CFR 404.2035 [a]; 416.635 [a]). Unlike *Robbins* and this case, in *Keffeler* the benefits were applied to cover the cost of the care of the actual Social Security recipient. The Court, moreover, focused on the fact that Washington provides care to children removed from their parents' custody at its own expense without any liability arising, giving "the [s]tate . . . no enforceable claim against its foster children" (*Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler, supra* at 386). The United States Supreme Court thus distinguished cases where a state seeks to attach Social Security benefits to satisfy some legally recognizable claim for the costs of a beneficiary's care and maintenance, and held that Washington was not alienating the children's benefits, but utilizing them in the children's best interests (*id.* at 388-389; *see Binder & Binder v Barnhart*, 399

F3d 128, 134 [2d Cir 2005] [recognizing that *Keffeler* "subtly disturbed," but did not undermine, *Robbins*]).

Nor does respondent's reliance on *Ruck v Novello* (295 F Supp 2d 258 [WD NY 2003]) persuade us that *Robbins* is no longer good law. There the court rejected the argument that the local social services agency had violated 42 USC § 407 when it refused certain requests by an institutionalized spouse to allocate income to a community spouse; thus, no attempt by said agency to assign or transfer benefits was at issue (*see id.* at 265). Indeed, the *Ruck* court specifically addressed, and distinguished, the scenario at issue here, noting that the case before it had presented "a far different situation from the one in *Robbins*, where [the local social services agency] attributed the institutionalized spouse's income to the community spouse, regardless of whether the institutionalized spouse actually transferred that income to the community spouse" (*id.* at 266).

We also reject respondent's attempt to distinguish *Robbins* because, here, DSS did not actually sue or directly threaten to sue decedent. By automatically allocating the husband's Social Security income to decedent, DSS violated 42 USC § 407. The "threat" of legal process was clearly present in that, unless decedent accepted that transfer, she was forced to execute the spousal refusal to support herself and, as a result, her estate has been subject to this litigation (*see Robbins v DeBuono*, 218 F3d 197, 202 [2000], *supra*).

Respondent also makes several arguments in support of DSS's claim against decedent's estate in connection with decedent's transfer of the couple's homestead—an exempt asset for the purposes of determining the husband's Medicaid eligibility—to a trust in 2001. Once the husband was determined eligible for benefits, decedent's resources as the community spouse were no longer deemed available to him (*see* Social Services Law § 366-c [5] [c]). Thus, although the transfer of the homestead for less than fair consideration potentially would have impacted decedent's Medicaid eligibility or, if she were the recipient of benefits herself, rendered her estate liable (*see* Social Services Law § 366 [5] [c] [3]; *Crabb v Estate of Mager*, 66 AD2d 20, 23-24 [4th Dept 1979]; *Matter of Rhodes*, 148 Misc 2d 744, 746 [1990]; *Matter of Rapalje*, 73 Misc 2d 16, 18 [1973]), we find no authority for the proposition that the transfer impacted the husband's eligibility in this case. If such transfer had produced assets which elevated decedent's income and assets above the

MMMA and CSRA, the husband's eligibility for services could have been impacted, but that did not occur here.*

Consequently, because "recovery for medical assistance from the estate of the secondarily deceased spouse can only be had on proof that such spouse, at the time of the furnishing of the medical assistance, was a financially responsible relative in that he or she had sufficient income and resources to provide medical assistance" (*Matter of Conroy*, 201 AD2d 855, 855 [1994]), and in light of our holding that no implied contract arose at the time that decedent executed the spousal refusal or at any point thereafter, we find that respondent has not established a cognizable claim against decedent's estate (*see* Social Services Law § 366 [3] [b] [i]; *Matter of Craig*, 82 NY2d 388, 390 [1993], *supra*; *cf. Commissioner of Dept. of Social Servs. of City of N.Y. v Fishman*, 280 AD2d 396, 398-399 [1st Dept 2001]). Accordingly, we must reject respondent's additional arguments that decedent's transfer of her home into a trust in 2001 violates Debtor and Creditor Law § 273 and EPTL 7-3.1, inasmuch as both of those provisions are designed to protect creditors from conveyances which would otherwise shield the assets from their reach (*see* Debtor and Creditor Law § 273; EPTL 7-3.1 [a]; *Bourgeois v Stadtler*, 256 AD2d 1095, 1096 [4th Dept 1998], *lv denied* 93 NY2d 805 [1999]). Further, our conclusion that respondent has not asserted a valid claim against decedent's estate obviates any need to address respondent's argument that Surrogate's Court erred in finding that it lacked jurisdiction over the assets in the trust created by decedent.

■ Finally, we find that Surrogate's Court did not err in denying petitioner's request for counsel fees. Petitioner relies on a rule of law that permits a prevailing party to recover reasonable counsel fees under 42 USC § 1988 in any action brought pursuant to 42 USC § 1983 " 'unless special circumstances would render such an award unjust' " (*Matter of Johnson v Blum*, 58 NY2d 454, 458 [1983], quoting *Newman v Piggie Park Enterprises, Inc.,* 390 US 400, 402 [1968]). Although petitioner filed no federal claim, he argues that he may recover counsel fees under 42 USC § 1988 by characterizing this action as a protection of decedent's federal rights. The Court of Appeals held that

---

* Respondent has not demonstrated that the proceeds from the sale of the homestead remained accessible to decedent following the transfer. Notably, the trust explicitly prohibited the trustee from making distributions for decedent's benefit and DSS recertified the husband for benefits in the years following the transfer.

"an award of attorney's fees under section 1988 is available when an asserted [f]ederal constitutional claim is 'substantial' and is joined with [s]tate claims with which it has a 'common nucleus of operative fact' " (*Matter of Thomasel v Perales*, 78 NY2d 561, 567 [1991]; *see Matter of Johnson v Blum, supra* at 458 n 2). However, unlike situations where individuals successfully commence litigation in state court asserting improper denial of benefits guaranteed by federal law, here it was never asserted that decedent was deprived of any such benefit (*cf. Matter of Northeast Cent. School Dist. v Sobol*, 79 NY2d 598, 602-603 [1992]; *Matter of Vollmer v Dowling*, 227 AD2d 349, 350 [1996]; *Matter of Martinez v Perales*, 135 AD2d 818, 819 [1987], *affd* 77 NY2d 923 [1991]; *State Communities Aid Assn. v Regan*, 112 AD2d 681, 681 [1985], *appeal dismissed* 66 NY2d 759 [1985], *appeal dismissed and lv denied* 69 NY2d 821 [1987]). Instead, this litigation arose when DSS objected to petitioner's attempt—under state law—to settle decedent's estate based on its assertion that it had an implied contract with decedent. Although requiring an interpretation of the state and federal statutes governing Medicaid benefits, we hold that this action does not equate with a claim asserted under 42 USC § 1983, rendering counsel fees under 42 USC § 1988 unavailable.

CARPINELLO, MUGGLIN, ROSE and LAHTINEN, JJ., concur.

Ordered that the order is affirmed, without costs.